**BAYTOWN CONSTRUCTION COMPANY, INC., Appellant,**

v.

**CITY OF PORT ARTHUR, TEXAS, et al., Appellees.**

**No. 09–88–245 CV.**

Court of Appeals of Texas, Beaumont.

June 14, 1990.

Kerwin Stone, Tommy Yeates, Moore, Landrey, Garth & Jones, Beaumont, for appellant.

Louis Mathis, George Wikoff, City of Port Arthur, Port Arthur, for appellees.

OPINION

BROOKSHIRE, Justice.

This is an appeal from the judgment in a suit Appellant brought for injunctive and declaratory relief and damages against Appellee City of Port Arthur and several city officials. The suit arose initially from penalties imposed upon Appellant by Appellee City for allegedly failing to perform a contract in conformity with Appellee City's "Residents Jobs Policy Ordinance." We reverse and render in part and remand in part.

Appellee City enacted its Ordinance No. 86–27, which facially attempted to require construction contractors dealing with the City of Port Arthur to employ Port Arthur "residents" *to perform 60 percent of the hours worked in each craft required to perform the contracted job.* The ordinance initially defined a "resident" as *"Any person for whom the principal place where that person normally eats and sleeps and maintains his or her normal personal and household effects is within the City limits of the City of Port Arthur, Texas."* Section 4 of the ordinance required the City's enforcing agency, the Urban Development–Community Development Department, to definitely *arrange recruitment and training* of resident employees *in conjunction with existing labor unions, and to establish a separate job screening and referral agency to refer city residents to contractors in order to help those contractors comply with the ordinance.* The Urban Development Department was empowered to impose sanctions for non-compliance by the contractor but was required to submit its regulatory scheme to the Port Arthur City Council for approval. No procedural guidelines were given to the agency.

Appellant was awarded a contract to construct a landfill for Appellee. In spite of the mandate of Section 4, inter alia, of the ordinance, Appellee City did not create a job screening and referral agency to assist Appellant in locating qualified, experienced Port Arthur residents for employment. Instead, Appellant was referred by Appellees to the Texas Employment Commission, which ultimately supplied Appellant with a statement that no qualified residents were to be found. Appellant then turned to the operating engineers' union local. The union was the logical one to supply operators—if not in practical terms the only one. The union agreed to make one-half of its referrals to Baytown from among the qualified, resident workers; the other half in order of their appearance on the local's out-of-work list to be assigned as required of the local by federal labor law. Appellant accepted those qualified workers who were shown to be Port Arthur residents, as forwarded and classified by the local union.

The business manager of the union local testified that Port Arthur residents were notified in advance when openings at the Baytown project were to be announced, giving those residents an advantage in obtaining work there. The union cooperated in good faith.

Appellant then commenced work on the landfill, submitting its weekly payroll to Appellee City. Within a month, a surprise jobsite inspection by the enforcing agency resulted in the contention that some employees who claimed to be residents of Port Arthur were not. Subsequently, the City withheld (without notice, hearing or consultation) the first progress payment from Appellant, precipitating a meeting at which the parties agreed to attempt to resolve the disputes.

It was at this meeting that Appellant was presented with a recently written opinion prepared by the City Attorney which equated "resident" to "domicile", substantially redefining "resident". "Resident" was to be broadened and to include "the elements of (1) actual residence and (2) *the intent to make it the permanent home.*" (Emphasis ours) This second element of "permanent home" was a new, lately added requirement. Apparently, at no time did Appellees make known to Appellant in what manner a determination of a given workman's address or residence was to be made: whether by driver's license, local tax rolls, utility bills, or otherwise. But these criteria were not originally in the job ordinance or in the construction contract.

On October 28, 1986 the City Council passed its ordinance number 86–263, the "enforcement resolution." This much later ordinance set out the procedures the enforcing agency was to follow in monitoring compliance with the jobs ordinance, and undertook to retroactively make determinative prior actions and decisions of Port Arthur's representatives with respect to Appellant. The enforcement resolution provided for the termination of the contract where the contractor refused on-sight residency inspections, or failed to be in compliance a second time. The enforcement resolution onerously and seriously impaired the construction contract and its obligations.

Foreseeing trouble, Appellant immediately brought its initial suit for an injunction against applying the new, lately adopted enforcement resolution against Appellant, and for declaratory judgment as to the constitutionality of the ordinance. This action was forestalled when the injunction was denied. Later, a partial summary judgment in favor of the City in effect declared the ordinances constitutional and approved the new, more onerous definition of "resident." This "partial judgment" attempted to change drastically the basic rules and provisions of the agreement.

Ultimately the landfill was completed. It was accepted totally by Appellee City as to the construction. Appellant was sanctioned for failing to abide by the Jobs Policy Ordinance. The sanctions consisted of a one percent penalty ($4,878.59)—the maximum limit—and a three-year ban on bidding for future construction projects for the City. These sanctions were imposed without proper notice or a hearing or any other indicia of due process.

Appellant then amended its suit to enjoin the new sanctions and for damages arising

from alleged misrepresentations by Appellee City as to tidal flooding at the jobsite. Appellant's theories of recovery included three separate due process grounds related to the ordinance and the enforcement thereof. The trial court decided that the earlier partial summary judgment precluded consideration of the due process claims. The judgment after a bench trial was in favor of Appellees.

On appeal, Appellant, inter alia, invokes constitutional bars to impairment of contracts, ex post facto laws and retroactive laws. Appellant further argues that any breach on its part was excused by Appellees' failure to implement, inter alia, training and placement programs under the Jobs Ordinance; that the ordinance violates right-to-work laws; that the trial court's judgment as to the tidal flooding issue was against the weight of the evidence; and that the trial court erred in failing to file findings of fact and conclusions of law.

■ Appellant asserts that the trial court erred in granting the City's motion for partial summary judgment. The City's motion contains two brief paragraphs. The first is to the effect that *the City is entitled to judgment as a matter of law with respect to the validity of the contract of June 17, 1986*, being the construction contract between the City and Baytown. The City argues that as a matter of law the Residents Jobs Policy Ordinance and Resolution No. 86–263 (the enforcement resolution) of the City Council are *valid in all respects and dispositive of this suit.* Furthermore, as a matter of law, the City argues that the definition of "residents" in the Residents Jobs Policy was equivalent to a much subsequent "domicile" or "domiciliary" definition. The trial bench concurred. To sustain its motion, the City relied upon the pleadings, a copy of the job ordinance, the construction contract, and Resolution No. 86–263, being a one page enforcement resolution with detailed, numerous, onerous, new, burdensome attachments. The City did not proffer affidavits. The City demanded a blanket judgment with a blanket, all-encompassing adjudication by the trial bench finding that the

ordinances in question were valid and constitutional in every respect as applied to Baytown and that they were part and parcel of the construction contract. The bench's agreement permeated the entire proceedings.

But a careful reading of the construction contract belies that contention. Nevertheless, the bench below ruled in its partial summary judgment that, inter alia, the Residents Jobs Policy Ordinance was valid under the laws and constitution of the State of Texas—the entirety of the Texas constitution as enforced—and was an integral and inseparable part of the contract of June 17, 1986, and that Resolution No. 86–263 is valid under the laws and the constitutions of Texas and the United States and was a lawful implementation of the Residents Jobs Policy Ordinance. That these ordinances controlled the procedures to be employed under the construction contract; and further, that the changed definition of "resident" under the job policy ordinance is valid under the laws and the constitutions; and "resident" means a permanent domiciliary.

These rulings were made even though the *definition of resident was changed and changed materially and burdensomely during the course of the construction of the landfill.* TEX.R.CIV.P. 166a entitled "Summary Judgment" absolutely requires that the moving party to be successful must be *entitled to judgment as a matter of law* on the issues set out in the motion. Without criticism of anyone we conclude that the City, under this record, was not entitled to judgment as a matter of law. Rule 166a(c). The movant must expressly prove all of the elements of its cause of action. This, we perceive, the City failed to do. *Furthermore, on factual matters there cannot exist a single genuine issue as to any material fact necessary to the movant's judgment.* Again, under this record, we, following accepted summary judgment proceedings, find genuine issues of material facts. Rule 166a(c).

In determining whether a genuine issue as to a material fact exists in this unusual type of procedure under Rule 166a, we are

mandated to take as true all the evidence that is favorable to the non-moving party. Importantly, we must take as true every reasonable inference from the evidence favorable to the non-moving party. These *inferences must be indulged in favorably toward the non-movant.* Any reasonable doubts concerning the evidence or the reasonable inferences therefrom are to be resolved to the benefit of the non-movant. *See Montgomery v. Kennedy*, 669 S.W.2d 309 (Tex.1984). We quote:

> The standards for review of summary judgment evidence are well established. Defendants moving for summary judgment must expressly present and conclusively prove all essential elements of their defense as a matter of law; there can be no genuine issues of material fact. *City of Houston v. Clear Creek Basin Authority*, 589 S.W.2d 671, 678 (Tex. 1979); *Gibbs v. General Motors Corp.*, 450 S.W.2d 827 (Tex.1970). In deciding whether there is a disputed material fact issue precluding summary judgment, evidence favorable to the non-movants will be taken as true. *Cowden v. Bell*, 157 Tex. 44, 46, 300 S.W.2d 286, 287 (1957). Every reasonable inference from the evidence must be indulged in favor of the non-movants and any doubts resolved in their favor. *Hudnall v. Tyler Bank & Trust Co.*, 458 S.W.2d 183, 185 (Tex. 1970).

*Id.* at 310–311.

In the face of the Appellant challenging the validity and the constitutionality of the ordinances on grounds such as lack of due process, impairment of existing contracts and other applicable statutory enactments and constitutional mandates (as applied to Baytown), the *City did not show as a matter of law that the ordinances passed all statutory and constitutional musters.*

On a separate tack, the obtaining of a partial summary judgment was, in our view, in the basic nature of an advisory opinion. Constitutionally, such advisory opinions are disallowed. *See* TEX. CONST. art. V, sec. 8. Article V, section 8 does not empower district courts to render advisory opinions—especially of such overbroad scope. *See State Bar v. Van Slyke*, 557 S.W.2d 363 (Tex.Civ.App.—Austin 1977, no writ). *See and compare United Services Life Insurance Company v. Delaney*, 396 S.W.2d 855 (Tex.1965); *Fireman's Ins. Co. of Newark, New Jersey v. Burch*, 442 S.W.2d 331 (Tex.1968).

But it is clear that in actuality the City did not *make a showing or endeavor* to obtain a decision from the bench as to the jobs ordinance or the enforcement resolution with onerous attachments (passed late into the work done under the construction contract) as *the same had been applied as to the Appellant.* Hence, Appellee obtained a decision as to the validity and constitutionality of the ordinances and resolutions in a factual vacuum without consideration of or presenting or rulings on the facts or the manner in which these instruments, ordinances and procedures were applied to Baytown. Clearly the able trial bench applied the concept of intended lifetime permanency which was embodied in the domiciliary concept to the job ordinance and did so diffusedly as to the entire cause of action.

It is glaringly clear that the City changed the basic ground rules after partial and considerable construction had taken place. The City through its own engineers vowed the work was excellent—nearly perfect—and wholly acceptable. Was this fair? Was this equitable? Was this just? Was this due process? *See and compare City of College Station v. Turtle Rock Corporation*, 680 S.W.2d 802 (Tex. 1984). We necessarily conclude that the granting of a partial summary judgment was error.

As originally written, the definition of "resident" in the ordinance plainly does not require any intent to make the City the permanent home. To have a "normal" place of eating and sleeping perhaps implies some duration, but the jobs ordinance is silent as to the length or character of that duration. In view of the original ordinance, is a new, restrictive meaning fair when applied against Appellant either retrospectively as a retroactive law imposing a new penalty for past transactions, or

prospectively, as an impairment of contract? All of the Baytown employees—with the possible exception of one—called as witnesses at the TRO hearing testified that they in fact lived inside the city limits of Port Arthur at the time. No substantial evidence was adduced to show that any of them primarily ate or slept anywhere else—nor maintained his or her personal effects elsewhere. No adequate pool of qualified long-time or short-term Port Arthur "resident" workers was shown by Appellees to exist at the hearing.

### Were the Ordinances Constitutionally Administered?

The detailed procedures approved and established by the enforcement resolution were not in place at the time of the initial investigation. This resolution was not even contemplated at contract time. The new procedures were not published to Appellant prior to the alleged violations. Appellant was not on reasonable, adequate notice as to what constituted a violation of the jobs ordinance, nor of the standards the "fact finder" or "enforcer" would apply in determining compliance. Hence, the significantly more onerous, heavier, more strident burdens and restrictions of the enforcement resolution cannot in fairness be applied to Appellant's conduct prior to October 31, 1986, the date the resolution was passed. A showing of knowing non-compliance with the requirements of the jobs ordinance during that early period was simply not shown in this record. A dearth of evidence fails to establish non-compliance at later times.

Further, Appellant's rights under the original, agreed-to contract are a property right protected by the due process and due course of law requirements of the Texas and United States constitutions. Appellant was entitled to notice that it was accused of violating the ordinance before summary forfeiture, and to a hearing prior to any finding of a violation resulting in sanction and maximum forfeiture. These basic, meaningful safeguards were never afforded Appellant. Unexpected withholding of payments took place. No notice, no hearing, no basic safeguards existed; due process and due course of law was offended.

The Appellant has a series of points of error. Upon this record, we conclude that the Residents Jobs Policy Ordinance as adopted and as applied and as enforced is unconstitutional, the same being in violation of Article I, section 19 of the Texas Constitution. When the penalties, forfeitures and sanctions were applied the same was done without notice, without a hearing, without an opportunity to be heard. We think that the Appellant has been deprived of property and a valuable property right without due course of the law of the land. No criticism is intended toward any one—absolutely none. The events took place unfortunately, fortuitously by serendipity. Due process had not been afforded Appellant.

Even after an informal meeting was held a workable formula or even a set of definitive guidelines were not delivered to Baytown as to personnel. In the application of this job ordinance fair notice was lacking. Within the backdrop of this record a reasonable person exercising reasonable intelligence could not with reasonable certainty know how to comply with the job ordinance as to employing qualified employees.

One of the City's senior executive officials testified that he could not define "domicile" after the residency definition had been greatly enhanced and he also testified that he did not know whether he would define "resident" differently from the way that it was set forth in the initial ordinance. He conceded that he didn't have any idea how long it would take to establish a residence in the City under the job ordinance. Port Arthur as a direct employer permitted a six months' period for a new employee to become a "resident". We perceive that the senior official conceded that a person's name in the telephone book or a person being a subscriber to the water utilities service of the City or a person being a registered voter in the City or a worker with a driver's license showing a Port Arthur address were not conclusive or even definitive or dispositive of the ques-

tion. He did opine that an employee should sleep and eat in Port Arthur. Baytown employees did so. A balanced statement is that the witness said that he would probably try to find the principal place where the employee normally eats and sleeps and maintains his normal, personal and household effects. These factors *may*—not necessarily—determine, in his opinion, residency. Again, Baytown's employees met these criteria. He then stated that he had not checked on the sleeping places nor had anyone under him checked on the sleeping places of Baytown's employees. This testimony was at the first hearing.

■ We think that the enforcement of the ordinance and the enforcement resolution with its attachments itself as applied and executed under this record was a retroactive law and was a law that impaired the obligations of a contract. Therefore, Article I, section 16 of the Texas Constitution was violated.

The challenged ordinances were, at least in application, violative of the spirit, rationale and basic reasonableness of the prohibitions against ex post facto laws. An ex post facto law or ordinance has been construed as an enactment passed after the occurrence of a fact or series of facts or the commissions of an act or series of acts which retrospectively changes the legal consequences of such actions. The Texas Constitution, we think, is more protective against governmental action and intrusion than is the United States Constitution. Importantly, the Texas Constitution forbids any retroactive law. TEX. CONST. art. I, sec. 16. The Texas Constitution mandatorily safeguards rights not fully guaranteed by other sovereign constitutions.

The basic concept of a retroactive law is to act upon matters that are already in the past. A retroactive law is an ordinance or governmental action which takes away or impairs and diminishes the rights acquired under existing laws or contracts or creates new obligations and imposes new duties in respect to transactions or contracts. An ordinance is constitutionally impermissibly retroactive when it takes away or impairs vested rights, creates new, heavy obligations or imposes novel, expensive duties with respect to past transactions and affects actions that accrued or vested at a prior time. A vested right need not be a property right.

The United States Constitution, Article I, section 10, forbids states to pass any law impairing the obligations of contract. Port Arthur is a home rule city. Its council is a mini-legislature. Its action is equivalent to state action. The basic, drastic and radical changes of the definition of resident to a permanent, lifetime-intended duration domicile was a retroactive measure and the Exhibit A attached to the enforcement resolution No. 86–263 comprises four pages of detailed additional, new impairments. Baytown's contract was realistically impaired.

### The City's Lack of Compliance

Concerning the job ordinance itself, the City did not follow it, but violated it. Section 3 said that certain language shall be included in all City contracts for construction projects; the wording was not included. Hence, the City violated this provision. It is clear that Section 7 concerning an important, helpful, liaison committee was not adhered to by the City. No liaison committee was set in place. It is clear that Section 9 concerning the training program was not followed by the City. Section 9 provides:

> The City of Port Arthur shall establish or cause to be established, either independently or in concert with Craft Unions and Construction Contractors, job training programs to train Port Arthur residents for skilled or semi-skilled construction jobs. These programs shall be supervised by the agency.

This record disproves any realistic compliance on the part of the City with crucial parts of its own job ordinance.

The record clearly reflects that many times there were simply not enough or even nearly enough qualified people under any definition of residency or domicile to man the construction work with qualified personnel. Baytown had to act; it was faced with a $2,000 a day penalty for late completion. The City, although obligated,

did not establish a job screening or referral agency *through which the City was to refer City residents to contractors or subcontractors and thereby enable the contractors to heed and comply with the ordinance.* Because of the failure of the City to comply with and heed its own job ordinance, such failure made it impractical, if not impossible, for the contractor herein, Baytown, to abide by the ordinance in any intelligent, safe, practical manner. The $2,000 a day late exaction was staring Baytown in the face.

As a typical example from a high executive official of Appellee:

Q Since the time of the Temporary Injunction hearing has the City of Port Arthur established any other referring and screening agency apart from Texas Employment Commission?

A No, sir.

Q Since that time has the City of Port Arthur worked in conjunction with any appropriate union and their existing collective bargaining agreements to recruit employees and arrange for training through an established apprenticeship programs [sic]?

A No, sir.

Q Since the time of the Temporary Injunction hearing has the City of Port Arthur established or caused to be established either independently or in concert with craft unions and construction contractors job training programs to train the Port Arthur residents for skilled or semi-skilled construction jobs?

A No, sir.

Q Are you aware that the language of that Jobs Ordinance says that the City of Port Arthur shall establish or cause to be established those items?

A I am.

Q And yet the City of Port Arthur has not done so?

A That's correct.

The TEC was not successful and declined to act as an agency of the City.

### The Nature of the Contract

The contract was not awarded solely on low bid. It was also awarded on Baytown's prior experience and qualifications. The construction work necessarily involved large D–8 dozers, scrapers and other various, sophisticated and very expensive, heavy equipment which required skilled operators. At an early time Baytown wrote the City asking for a list of the training programs and a list of qualified workers. No answer was received. No qualified, trained employees were initially located through the City or the TEC. It is clear that qualified workers were impossible to locate who had been "residents" of the City, following the provisions of the job ordinance.

The employees hired by Baytown listed Port Arthur addresses on their important W–4 forms and were located at those addresses by registered letters with return receipts. At a very early (as well as the only) meeting concerning alleged non-compliance, Baytown asked specifically which of the employees were not in compliance with the jobs ordinance. Apparently the City produced a list of every one on the project including the superintendent-owner. The superintendent-owner could not, without arbitrariness, be considered a member of a construction craft. Query: Was this a good faith list? The job ordinance regulated only the crafts; it did not disqualify owners or managers. A working, practical list of qualifications to establish residency was not tendered to Baytown. We find no showing *that 60 percent of the working hours of the employees in each craft* was not performed by residents of the City. That 60 percent was all the ordinance required. Baytown necessarily had to consider the specialized type of heavy equipment involved when hiring a qualified operator. The safety of the crew was directly imperiled.

The Texas Employment Commission certified that it could not supply the needed qualified employees in the various crafts. The record reflects that after considerable effort the Texas Employment Commission obtained the names of 50 operators. Of

these 50, the Texas Employment Commission determined *that only five were residing in Port Arthur.* Of the five, however, four could not be reached or contacted in any manner by TEC. The remaining fifth person was not qualified to operate the very large, heavy equipment used on the sanitary landfill project. TEC tried hard to help; but TEC could not perform through no fault of its own.

### The Union's Efforts

After the impracticality or impossibility of the TEC furnishing qualified operators and personnel to Baytown, it turned to an appropriate, well-recognized labor organization for help and references. The record reflects that the union made extreme good faith efforts to abide by the jobs ordinance. The record reflects that special training and special qualifications were needed for an operator to operate such heavy equipment as dozers, trackhoes, draglines, scrapers, rollers and compactors. The union, the International Union of Operating Engineers, Local 450, was the most likely and practical place to find such trained, qualified personnel. The union business agent made significant special efforts to contact Port Arthur residents who were qualified to do the work. The business manager said that he was trying to accomplish the very thing required by the job ordinance.

In every instance (there was one exception), the employees of Baytown testified that they had *properly filled out their W–4 forms* and that they normally ate and slept in Port Arthur and they had their normal personal and household effects in that city. The testimony from the City's engineer is clear and unequivocal. It is this: that the construction contract was satisfactorily performed and completed; it was good construction.

Significant and crucial are the considerations that Baytown continued to provide labor and materials pursuant to the contract until the full and final completion of the contract work. Baytown was never instructed to quit.

*Salient and of paramount importance is the fact that Baytown obtained a certificate from TEC stating that no qualified Port Arthur residents were available.* The Appellant submitted certified payrolls to the City on a weekly basis. Baytown was concerned and looked to see that an employee hired had a Port Arthur address and that the employee had filled out a form W–4 reflecting a Port Arthur address. These were the forms that were filled out for Internal Revenue purposes and the employees list their own addresses. These forms necessarily needed to be accurate so that at the end of a calendar year the information would be available to the employee for federal income tax purposes. The workers could not have desired to engender problems with the I.R.S. As an additional check, Baytown mailed to its employees certified letters with return receipts. The Port Arthur addresses were *shown to be correct in each case.*

The record reflects that a representative of the City without notice or permission of Baytown came on the jobsite. The representative of the City proceeded to inspect drivers' licenses of the employees. These actions by the City caused Baytown to sustain additional costs and operating expenses. There is no evidence that the contract or the job ordinance countenanced an interruption of work. Reasonable inspections of the progress of the work do not encompass interruptions involving expensive equipment and interruptions in the orderly sequence of work having an adverse effect upon the rest of the project and slowing the work.

### Is the Evidence Sufficient as to the Tidal Influence Issue?

When considering legal sufficiency or "no evidence" points, we consider only the evidence, and reasonable inferences therefrom, which viewed in their most favorable lights support the finding. We disregard all evidence and inferences to the contrary. *Garza v. Alviar,* 395 S.W.2d 821 (Tex.1965). If there is any probative evidence to support the finding on the tidal issue, the attacking point must be overruled. *Id.* In a factual sufficiency chal-

lenge, we consider all of the evidence including that which is contrary to the finding. *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951). Calvert, " 'No Evidence' and 'Insufficient Evidence' Points of Error", 38 TEXAS L.REV. 361 (1960); Garwood, *"The Question of Insufficient Evidence on Appeal"*, 30 TEXAS L.REV. 803 (1952). We may sustain a factual sufficiency point only if we determine that the finding of a vital fact is so contrary to the great weight and preponderance of the evidence as to be clearly wrong and unjust. *Id.*

■ In the instant case, Appellees' first witness was the engineer who prepared the maps of the jobsite upon which the bidding was based and which were referred to during the project. This witness testified extensively as to the contours and drainage characteristics of the jobsite and surrounding terrain, and gave a clear and credible account of how rapid backing-up of rain runoff and persistent flooding could account for the phenomena attributed to tidal effects by Appellant's witnesses. Hence, this Appellant's point of error is overruled.

The City proffered several witnesses to show non-compliance with the job ordinance. We perceive that no one of them qualified as a permanent domiciliary under the City's amended definition. Aside from the permanent, intended, lifetime domicile test, we perceive that one was a renter, one was employed elsewhere, one testified that when he signed up on the union out-of-work list his position was way down on the same. Another could not remember the date of his application for employment with Baytown. It was not shown that vacancies existed when these applicants made their applications. These witnesses certainly did not show that they could have performed in a qualified, experienced, skilled manner 60 percentum of the work hours craft by craft. It should be remembered and stressed that the necessary language of the job ordinance was not incorporated into the construction contract of Baytown. This the City failed to do. In fairness, it must be borne in mind that the City failed to carry out the major operative parts and paragraphs of its own job ordinance. We necessarily decide that the forfeited money is ordered paid to Baytown; that the title, possession, enjoyment, use and benefit to the fullest extent without any limitations or strings is settled upon Baytown and awarded to Baytown; this concerns the final payment of $62,280.57; further, any prohibition against Baytown bidding on contracts for three years is ordered set aside and disallowed.

■ We remand the matter only for the determination of Baytown's attorneys' fees. Logically, we should be empowered to determine correctly the proper appellate fee. Nevertheless, we remand this issue to the trial bench. We prudently observe, however, that the evidence and testimony concerning attorneys' fees is almost, if we may be bold to say, virtually conclusive. The only evidence on the attorneys' fees was offered by Baytown. The brief cross-examination showed that the attorneys' fees as testified to applied to the job ordinance issue. We observe that the attorneys' fees from the trial as testified to, in view of the entire record before us, appears very reasonable.

We do not hold that the job ordinance, under all circumstances, is unconstitutional. If the City with adequate notice defined in clear and unambiguous terms the meaning of "resident", "domicile", and other crucial terms and if the City set out with clarity the criteria for investigating, testing and determining the same, and if no changes were made in the definitions or the enforcement ordinances and if within reasonableness the City adhered to the provisions of its own ordinance law; we perceive that the job ordinance would be constitutional.

The case is remanded to the trial court with instruction to enter judgment for Appellant on all the issues concerning the Jobs Policy Ordinance, disallowing any sanctions, voiding all penalties assessed against Appellant by Appellees. We order that Appellant recover its taxable costs and attorneys' fees in harmony and pursuant to this opinion.

REVERSED AND RENDERED IN PART; REMANDED IN PART.